**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

ROXIE GOOCH,

                    Plaintiff,

v.                                  CIVIL ACTION NO.   2:22-cv-00184

CEBRIDGE ACQUISITION LLC, et al.,

                    Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court are two Motions to Compel Arbitration and to Stay Litigation filed by Defendants Altice USA, Cebridge Acquisition, LLC, Cequel III Communications I, LLC, and Cequel III Communications II, LLC's (collectively "Defendants" or "Suddenlink").   (ECF Nos. 8, 21.)   For the reasons explained in greater detail below, the Court **DENIES** Defendants' Motions.

## I.   BACKGROUND

Suddenlink is a provider of broadband internet, television, and telephone services, and provides those services in the state of West Virginia.   (ECF No. 9 at 8.)   This civil action, brought by Plaintiff Roxie Gooch ("Plaintiff" or "Gooch"), involves Suddenlink's Residential Services Agreement   ("RSA")—which   Plaintiff   repeatedly   characterizes   as   "ever-changing," "unconscionable," "self-contradicting," and "adhesi[ve]", as well as Suddenlink's alleged failure to provide safe, adequate, and reliable service to its West Virginia customers.   (ECF No. 1-1 at

1

7.)    Undoubtedly, Suddenlink's questionable business practices and tumultuous business relationship with the State of West Virginia and its residents are well-documented.   Earlier this year, the West Virginia Public Service Commission found that Suddenlink "failed to provide safe, adequate and reliable service to its West Virginia subscribers," (ECF No. 11-7), and the cities of Beckley, Charleston, and Elkins, West Virginia have characterized Suddenlink as "a loosely regulated service provider" that has "abus[ed] its monopoly power," (ECF No. 11-8 at 4). Notably, this Court is currently presiding over two lawsuits, which are identical to the present matter, brought by two other Suddenlink customers Richard Chaty ("Chaty") and Benjamin Meadows ("Meadows").   *See Chaty v. Cebridge Acquisition, LLC et al.*, 2:22-cv-00188; *Meadows v. Cebridge Acquisition, LLC et al.*, 2:22-cv-00193.

   A.  *Factual Background*

   Plaintiff became a Suddenlink customer in July 2017.   (ECF No. 9 at 8.)   To complete installation and active service, Plaintiff was required to agree to the terms and conditions of the RSA, (*see* ECF No. 8-1 at 4), as discussed more fully below.   At the time Plaintiff signed up for services, the RSA stated that Suddenlink could, "in its sole discretion, change, modify, add or remove portions of [the RSA] at any time by posting the amended Agreement on the Company website at www.suddenlink.com, or by giving Customer notice in accordance with Section 22 of [the RSA]."   (ECF No. 8-2 at 37.)   In the coming years, Suddenlink certainly would not be shy about using that discretion.   Although it is unclear how many times Suddenlink updated its RSA from the time Plaintiff allegedly initially assented to it, Suddenlink changed the terms of the RSA at least five times: September 19, 2019, (*Id.* at 28), June 19, 2020, (*Id.* at 32), August 24, 2020, (*Id.* at 29), July 25, 2021, (*Id.* at 17), October 1, 2021, (*Id.* at 13).   Suddenlink has also updated

2

the RSA twice during the pendency of this litigation on May 27, 2022, and again on June 6, 2022. (ECF No. 11 at 7.)

### B. Procedural Background

Plaintiff initiated this action in the Circuit Court of Fayette County on March 14, 2022. (ECF No. 1 at 1.)   Plaintiff asserted four causes of action: (1) Declaratory Judgment/Unenforceable Contract, (2) Unjust Enrichment/Quasi Contract, (3) Negligence, and (4) Breach of Contract.   (*Id.* at 2.)   On April 14, 2022, Defendants removed this matter to federal court.   (ECF No. 1.)

Defendants filed the first Motion to Compel Arbitration and to Stay Litigation on May 23, 2022.   (ECF No. 8.)   Plaintiff responded, (ECF No. 11), and Defendants replied, (ECF No. 14). Defendants then filed a second Motion to Compel Arbitration and to Stay Litigation on August 1, 2022.   (ECF No. 21.)   Plaintiff responded, (ECF No. 23), and Defendants replied, (ECF No. 25). As such, both motions are fully briefed and ripe for adjudication.[1]

## II.    LEGAL STANDARD

The Federal Arbitration Act ("FAA") provides that a written agreement to arbitrate in any contract involving interstate commerce "shall be valid, irrevocable, and enforceable" unless there are grounds for revocation in law or equity.   9 U.S.C. § 2; *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).   To compel arbitration under the FAA,[2] the movant must

---

[1] Both motions are substantively identical.   (*Compare* ECF No. 8 *with* ECF No. 21; *compare* ECF No. 9 *with* ECF No. 22.)   Plaintiff raised additional arguments in her response to the second motion, (*see* ECF No. 23), which the Defendants addressed in their reply, (*see* ECF No. 25.)   All arguments will be addressed below, but, for clarity, the Court will refer to both motions as one.

[2] Sections 3 and 4 of the FAA "provide[ ] two parallel devices for enforcing an arbitration agreement[.]"   *Dillon v. BMO Harris Bank, N.A.*, 787 F.3d 707, 713 (4th Cir. 2015) (quoting *Moses*, 460 U.S. at 24).   Section 3 "requires a court to stay 'any suit or proceeding' pending arbitration of 'any issue referable to arbitration under an agreement in writing for such arbitration.' This stay-of-litigation provision is mandatory."   *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 500 (4th Cir. 2002 (quoting 9 U.S.C. § 3).   Under Section 4, a "party aggrieved by the alleged failure, neglect,

prove the following four elements: "'(1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction . . . to interstate or foreign commerce, and (4) the failure, neglect or refusal of the [party] to arbitrate the dispute.'"   *Am. Gen. Life & Accident Ins. Co. v. Wood*, 429 F.3d 83, 87 (4th Cir. 2005) (quoting *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 500–01 (4th Cir. 2002)); *Galloway v. Santander Consumer USA, Inc.*, 819 F.3d 79, 84 (4th Cir. 2016) (quoting *Rota-McLarty v. Santander Consumer USA, Inc.*, 700 F.3d 690, 696 n.6 (4th Cir. 2012)). Conversely, "[u]nder the FAA, 'the party seeking a jury trial must make an unequivocal denial that an arbitration agreement exists,'" and "'show genuine issues of material fact regarding the existence of an agreement to arbitrate.'"   *Galloway*, 819 F.3d at 85 (quoting *Chorley Enterprises, Inc. v. Dickey's Barbecue Restaurants, Inc.*, 807 F. 3d 553, 564 (4th Cir. 2015)).

Thus, the applicable standard of review is "'akin to the burden on summary judgment.'" *Id.* n.3 (same).   "Specifically, the pleadings and all relevant, admissible evidence submitted by the parties are considered and all reasonable inferences are drawn in favor of the non-moving party."   *Barach v. Sinclair Media III, Inc.*, 392 F. Supp. 3d 645, 650 (S.D. W. Va. 2019) (internal quotations and citations omitted).

### III.   DISCUSSION

In the pending motion, Suddenlink does not address the four elements set forth above. (*See generally* ECF Nos. 9, 14, 22, 25.)   Nevertheless, the first element—the existence of a dispute

---

or refusal of another to arbitrate under a written agreement for arbitration" may petition a district court "for an order directing that such arbitration proceed in the manner provided for in such agreement."   9 U.S.C. § 4.   The four elements provided above must be satisfied in motions brought under § 3 as well those brought under § 4 of the FAA. *See Noe v. City Nat'l Bank of W. Virginia*, 828 F. App'x 163, 165 (4th Cir. 2020) (citing *Adkins*, 303 F.3d at 500-01).

between the parties—is certainly satisfied because Plaintiff claims that Suddenlink has failed to provide safe, adequate, and reliable services.   (ECF No. 1-1 at 2).   Similarly, the Court is satisfied that the third element—that the transaction at issue relates to interstate commerce—is met because the provision of internet or television service inherently involves interstate commerce.   *See United States v. Gray-Sommerville*, 618 F. App'x 165, 168 (4th Cir. 2015).   Likewise, the fourth element is satisfied because Plaintiff filed this lawsuit and opposed the pending motions to compel, thereby clearly refusing to arbitrate her claims against Suddenlink.

However, Plaintiff disputes the second element.   Specifically, Plaintiff claims that she did not enter into an arbitration agreement with Suddenlink.   (ECF No. 11 at 9.)   Alternatively, Plaintiff argues that, if she did enter into an arbitration agreement, it is not enforceable.   (*Id.* at 12.)   Each is discussed in turn.

A.   *Agreement to Arbitrate*

The court must order a party to arbitrate if it finds that the party made at least one valid agreement to arbitrate that applies to the present dispute.   *See, e.g.*, *Snowden v. CheckPoint Check Cashing*, 290 F.3d 631, 639 (4th Cir.2002) (ordering arbitration when the plaintiff had signed twelve separate agreements with a company, one of which contained an arbitration clause).   Importantly, though, federal courts have developed and applied a "severability doctrine" under which challenges to an arbitration clause itself are heard by the court considering the FAA claim, whereas challenges to the contract *as a whole* are referred to the arbitrator.   *See id.* at 637.   Consequently, a court can only consider challenges that "specifically relate" to the arbitration clause, instead of to the agreement generally.   *See id.*   Thus, although Plaintiff challenges the

validity and enforceability of the entire RSA, the Court will only consider Plaintiff's arguments that relate to the arbitration agreement contained therein.

To that extent, though, the parties dispute which version of the arbitration agreement is operative.   On the one hand, Suddenlink submitted its briefing on the assumption that the arbitration agreement contained within RSA in effect at the time the instant lawsuit was filed governs the instant case.   (*See* ECF No. 14 at 1 (noting that Plaintiff's complaints about Suddenlink's most recent updates to its terms "are a red herring because Suddenlink's motion is based on the earlier version of the RSA that was in force at the time these lawsuits were filed").) That version was attached as Exhibit A to the Affidavit of William Heberer in Support of Defendants' Motion to Compel Arbitration and to Stay Litigation.   (ECF No. 8-2 at 5–19.)    On the other hand, Plaintiff boldly submitted her Response presuming that Suddenlink's most recent updates to the arbitration agreement govern the instant case.   (ECF No. 11 at 1 ("On June 6, 2022, . . . [Suddenlink] posted yet another even more oppressive arbitration provision, 'Effective July 20, 2022,' which is retroactive to pending disputes.").)   Plaintiff attached that version to her Response as Exhibit N.   (ECF No. 11-18.)

Ultimately, the Court disagrees with both parties.   Instead, the arbitration agreement in effect in July 2017 at the time Plaintiff signed up for services (the "2017 Arbitration Agreement"), which was attached as Exhibit C to the Affidavit of William Heberer in Support of Defendants' Motion to Compel Arbitration and to Stay Litigation, (ECF No. 8-2 at 37–59), is operative because (1) there are no genuine issues of material fact that Plaintiff entered into the 2017 Arbitration Agreement, and (2) Suddenlink's attempts to unilaterally modify the terms thereafter were ineffective.   Each is discussed in turn below.

6

1.   <u>Plaintiff entered into the 2017 Arbitration Agreement</u>

The FAA was intended "to make arbitration agreements as enforceable as other contracts, but not more so."   *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989) (emphasis added) (internal quotation marks omitted).   Thus, "the FAA does not require parties to arbitrate when they have not agreed to do so."   *Id.*   To decide "whether the parties agreed to arbitrate," a court must then apply "ordinary state-law principles that govern the formation of contracts."   *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *Wood*, 429 F.3d at 87 ("Although federal law governs the arbitrability of disputes, ordinary state-law principles resolve issues regarding the formation of contracts.").   In West Virginia, as elsewhere, "[t]he elements of a contract are an offer and an acceptance supported by consideration."   *Elk River Pipeline LLC v. Equitable Gathering LLC*, Civil Action No. 2:10-cv-01080, 2013 WL 164151, at *9 (S.D. W. Va. Jan. 15, 2013) (citations omitted); *see also State ex rel. AMFM, LLC v. King*, 740 S.E.2d 66, 73 (W. Va. 2013) ("[T]he fundamentals of a legal contract are competent parties, legal subject matter, valuable consideration and mutual assent." (quoting *Virginian Exp. Coal Co. v. Rowland Land Co.*, 131 S.E.2d 253, 254 (W. Va. 1926))).   There is no valid contract if one of these essential elements is absent.   *See, e.g.*, *King*, 740 S.E.2d at 73 ("There can be no contract if there is one of these essential elements upon which the minds of the parties are not in agreement." (quoting *Virginian Exp. Coal Co.*, 131 S.E.2d at 254)).

In this case, Plaintiff entered into the 2017 Arbitration Agreement when she signed up for services because all the essential elements of contract formation are met.   There are no genuine issues of material fact that Plaintiff accepted Suddenlink's offer.   Further, despite any contention otherwise, the 2017 Arbitration Agreement was supported by adequate consideration.

7

i.      Offer and acceptance

The offer and acceptance, often referred to as "mutual assent," requires "a proposal or offer on the part of one party and an acceptance on the part of the other."   *Ways v. Imation Enters. Corp.*, 589 S.E.2d 36, 44 (W. Va. 2003) (quoting *Bailey v. Sewell Coal Co.*, 437 S.E.2d 448, 450–51 (W. Va. 1993)).   "Both the offer and acceptance may be by word, act or conduct that evince the intention of the parties to contract."   *Bailey*, 437 S.E.2d at 450–51.   This intent can be shown "by direct evidence of an actual agreement or by indirect evidence through facts from which an agreement may be implied."   *Id.* (internal citations omitted).

Here, the parties do not dispute that there was an offer or acceptance.   To activate its customers' services, Suddenlink sends a field technician to its customers' residences to install any equipment necessary for the provision of services.   (ECF No. 11-8 at 2–3.)   During the installation appointment, field technicians present Suddenlink customers with a mobile device containing several electronic pages with which the customers, including Plaintiff, were required to interact.   One electronic page Suddenlink customers are required to interact with includes the full text of the RSA in effect at the time of installation, or, alternatively, a hyperlink to the RSA in effect at the time of installation.   (*Id.*)

To complete installation and active service, Suddenlink customers are required to sign the mobile device screen under a series of acknowledgements, which included, among others, the following statements:

> By your signature: (i) you represent that you are the Customer or Customer's authorized agent; (ii) you have been given an opportunity to review this Work Order and the [RSA] of which this Work Order is a part; (iii) you agree to the terms and conditions of the [RSA]; . . . and (vi) you acknowledge that THE RESIDENTIAL SERVICES AGREEMENT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES.

8

(ECF No. 8-1 at 4) (emphasis in original).   An acknowledgment of this nature is sufficient to constitute acceptance of an offer under West Virginia law.   *See Mey v. DIRECTV, LLC*, 971 F.3d 284, 288 (4th Cir. 2020) (holding that plaintiff formed a contract under West Virginia law by signing an electronic device with an acknowledgement stating that the customer agreed to the contract terms).

Plaintiff, a Suddenlink customer, had a field technician perform the installation services described above on July 7, 2017.   (ECF No. 9 at 2.)   At the time of Plaintiff's installation appointment, the mobile device presented to her by the field technician contained a hyperlink to the RSA that she was given the opportunity to press to review the full text of the then-current RSA. (ECF No. 8-1 at 3–4.)   At that time, Plaintiff, or an authorized representative, was required to enter a signature on the mobile device presented to them, consistent with Suddenlink's business practices described above.   (*Id.* at 4.)

Aside from the affidavit of Travis Lucas—Suddenlink's Director of Operations Field Service, Mid Atlantic—which states that Plaintiff was required to enter her signature on the mobile device, Suddenlink has provided no documentary evidence demonstrating that Plaintiff, in fact, affixed her signature to the mobile device when prompted.   (*See generally* ECF No. 8-1.)   While the Court is hesitant to just blindly accept Suddenlink's word that Plaintiff actually affixed her signature to the mobile device during her installation appointment, Plaintiff does not appear to otherwise dispute that she agreed to the RSA, which included the 2017 Arbitration Agreement, during her installation appointment.   (*See generally* ECF Nos. 11, 23.)

Thus, there are no genuine issues of material fact that Plaintiff accepted Suddenlink's offer. *See Galloway*, 819 F.3d at 85.

ii.    Consideration

Although unclear, Plaintiff seems to argue that that the 2017 Arbitration Agreement lacked consideration and, thus, was "illusory."   (*See* ECF No. 11 at 9.)    Specifically, Plaintiff claims that "each arbitration cause incorporates by reference future iterations, so Suddenlink can update the provision at will and without notice . . .."   (ECF No. 11 at 10.)    The Court disagrees as it relates to the 2017 Arbitration Agreement.

Under West Virginia law, "[c]onsideration has been defined as 'some right, interest, profit, or benefit accruing to one party, or some forbearance, detriment, loss, or responsibility given, suffered, or undertaken by another.' A benefit to the promisor is sufficient consideration for a contract."   *Cook v. Heck's Inc.*, 342 S.E.2d 453, 458059 (some citations omitted).   The only consideration required to enforce an arbitration agreement is that both parties are bound by the resolution format.   *See Adkins*, 303 F.3d at 501 ("[N]o consideration [is required] above and beyond the agreement to be bound by the arbitration process." (internal quotation marks and citation omitted)).   Nevertheless, the Supreme Court of Appeals of West Virginia ("WVSCA") has explained the limitations on a promise as consideration:

> A promise becomes consideration for another promise only when it constitutes a binding obligation. Unlike a binding obligation, an "illusory promise" appears to be a promise, but it does not actually bind or obligate the promisor to anything. Because an illusory promise is not binding on the promisor, an illusory promise cannot constitute consideration.

*Donna S. v. Travis S.*, 874 S.E.2d 746, 754 (W. Va. 2022) (internal citations omitted).

For example, in the arbitration context, a promise to arbitrate can be illusory if the promisor retained the right to unilaterally amend or revoke the arbitration clause at any time.   *But see Hill v. PeopleSoft USA, Inc.*, 412 F.3d 540, 543 (4th Cir. 2005) (citing *Cheek v. United Healthcare of*

*the Mid–Atlantic, Inc.*, 835 A.2d 656, 662 (Md. 2003)).   In *Hill*, the defendant issued the plaintiff, Hill, a written offer letter, which provided that, "as a condition of her employment, Hill would have to sign a separate arbitration agreement."   412 F.3d at 542.   "The Arbitration Agreement signed by the parties [was] a comprehensive six-page document" that set forth "both Hill and [the defendant's] obligations concerning arbitration," and bound the parties "to arbitrate all claims arising out of Hill's employment relationship with [the defendant], with certain enumerated exceptions."   *Id.* at 542 (internal quotation marks omitted).   Notably, "neither party reserved the right to modify the agreement's terms."   *Id.*

The offer letter "also indicated that Hill, by accepting [the defendant's] offer of employment, was agreeing to be bound by the company's 'Internal Dispute Solution' program (the IDS Program)."   *Id.*   But, "[u]nlike the Arbitration Agreement," the IDS Program was "a company policy generally applicable to all employees."   *Id.* (internal quotation marks omitted).   And, notably, "in the IDS Program [the defendant] reserved the right to change the program without notice."   *Id.* (internal quotation marks omitted).

Hill later brought suit in federal court, asserting claims for, among other things, discrimination and retaliation.   *Id.*   The defendant moved to compel arbitration, which the district court denied, finding that, in light of [the defendant's] right to change the terms of the IDS Program, the parties' agreement to arbitrate was illusory.   *Id.*   On appeal, the Fourth Circuit vacated the decision of the district court and remanded the case "with instructions to grant [the defendant's] motion to compel arbitration," *id.* at 545, because the district court erred in "look[ing] beyond the separate Arbitration Agreement, signed by the parties, to determine whether [it] was supported by consideration," *id.* at 543.   Instead, the Fourth Circuit concluded that, despite a

11

modification provision in a related document, the arbitration agreement was not illusory because it was "a specific, comprehensive document, setting forth all of the parties' rights and obligations concerning arbitration[,]" and contained no modification provision.   *Id.* at 544.

In this case, the 2017 Arbitration Agreement is not illusory.   Like the arbitration agreement in *Hill*, the 2017 Arbitration Agreement sets forth both Plaintiff's and Suddenlink's obligations concerning arbitration.   Like the arbitration agreement in *Hill*, the 2017 Arbitration Agreement does not include a reservation of right to modify the terms.   Instead, similar to the IDS Program in *Hill*, the RSA included a modification clause that reserved Suddenlink's right to change the terms and conditions of the RSA—including the 2017 Arbitration Agreement.

The Court acknowledges that, unlike the case in *Hill*, the 2017 Arbitration Agreement is not a separate, physical document, and the RSA's modification clause permits Suddenlink to change the terms of the 2017 Arbitration Agreement.   Nevertheless, the Supreme Court of the United States ("Supreme Court") has made clear that, because "an arbitration provision is severable from the remainder of the contract . . . unless the challenge *is to the arbitration clause itself*, the issue of the contract's validity is considered by the arbitrator in the first instance." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445–46 (2006) (emphasis added) (holding that a claim that a purportedly usurious contract containing an arbitration provision was void for illegality was to be determined by arbitrator, not court, where claim challenged contract as whole, not arbitration provisions in particular, and arbitration provisions were thus enforceable apart from the remainder of the contract).   Therefore, unlike the district court in *Hill*, this Court will not look at the modification clause that is not contained within the 2017 Arbitration Agreement.

Thus, because the 2017 Arbitration Agreement did not include a modification clause, there are no genuine issues of material fact that the 2017 Arbitration Agreement was supported by consideration.

### 2.   Plaintiff did not assent to the subsequent arbitration agreements.

Suddenlink argues that Plaintiff agreed to the subsequent arbitration agreements in multiple ways, "any one of which is independently sufficient." (*See* ECF No. 9 at 14.) Specifically, Suddenlink claims that Plaintiff agreed to the later RSAs—and the arbitration agreements contained therein—by (1) accepting the terms during service visits, (2) continuing to pay for and receive Suddenlink services, and (3) receiving email confirmations regarding their services. (*See id.* at 14–16.) During service visits, Plaintiff signed a mobile-device screen that stated the following:

> BY SIGNING BELOW, CUSTOMER ACKNOWLEDGES THAT ALL INFORMATION ON THIS WORK ORDER, INCLUDING . . . GENERAL TERMS AND CONDITIONS OF SERVICE PROVIDED DURING TIME OF SERVICE APPOINTMENT AND AVAILABLE AT SUDDENLINK.NET/SERVICEINFO, HAS BEEN READ AND AGREED TO.

(*Id.* at 14–15.)

Similarly, each of Plaintiff's billing statements have provided that, "[p]ayment of this bill confirms your acceptance of the Residential Services Agreement, viewable at suddenlink.com/terms-policy." (*Id.* at 16.) Plaintiff also received at least one email that instructed her to "[v]isit suddenlink.com/terms-and-policies for information about your Suddenlink services, including our General Terms & Conditions of Service." (*Id.*)

Conversely, Plaintiff asserts that these efforts were ineffective in creating a binding arbitration agreement, (ECF No. 11 at 8 (relying on filed affidavits)), and "[t]he idea that a

Suddenlink customer is voluntarily consenting to arbitration . . . because the terms are posted on the website, referenced in the bills, mailed with the bills, or presented during a service call is absurd," (ECF No. 11-3 at 10, ¶ 22).   Notably, Plaintiff argues that, because Suddenlink "can change the terms [of the RSA and arbitration agreement contained therein] whenever it wants, [] consenting to any terms is a meaningless exercise as you have no idea what you are agreeing to." (*Id.*)

Thus, it is clear that the parties dispute whether there was mutual assent to the subsequent arbitration agreements.   Concerning mutual assent to contract, the WVSCA has held:

> It is elementary that mutuality of assent is an essential element of all contracts. In order for this mutuality to exist, it is necessary that there be a proposal or offer on the part of one party and an acceptance on the part of the other. Both the offer and acceptance may be by word, act or conduct that evince the intention of the parties to contract. That their minds have met may be shown by direct evidence of an actual agreement or by indirect evidence through facts from which an agreement may be implied.

*Bailey v. Sewell Coal Co.*, 437 S.E.2d 448, 450-51 (W. Va. 1993) (internal citations omitted).

However, when analyzing mutual assent in the context of an employer's modifications to its unilateral contract with employees, the WVSCA held that "a subsequent modification may be made unilaterally by the employer, *but to make the modification effective* the employer is required to give the employees *reasonable notice of the changes*."   *Hogue v. Cecil I. Walker Machinery Company*, 431 S.E.2d 687, 691 (W. Va. 1993) (emphasis added); *see also New v. GameStop, Inc.*, 753 S.E.2d 62 (W. Va. 2013) (employee handbook to be a binding and enforceable arbitration agreement, even though GameStop could unilaterally modify the agreement after giving thirty days' notice).

The WVSCA's decision in *Citizens Telecommunications Company of West Virginia v. Sheridan*, 799 S.E.2d 144 (W. Va. 2017), is instructive.   In *Sheridan*, the respondents were West Virginia residents who initially subscribed to Frontier's residential "high-speed Internet service" between August 2007 and June 2010.  *Id.* at 146.   The Terms and Conditions, available on Frontier's Internet website, provided that "**BY USING FRONTIER HIGH SPEED INTERNET SERVICES OR EQUIPMENT YOU ARE AGREEING TO THESE TERMS AND CONDITIONS**."  *Id.* at 147 (emphasis in original).   The terms and conditions included a modification provision:

> **UNLESS OTHERWISE PROHIBITED BY LAW, FRONTIER MAY CHANGE PRICES, TERMS AND CONDITIONS AT ANY TIME BY GIVING YOU 30 DAYS NOTICE BY BILL MESSAGE, E-MAIL, OR OTHER NOTICE, INCLUDING POSTING NOTICE OF SUCH CHANGES ON THIS WEBSITE, UNLESS THE PRICES, TERMS AND CONDITIONS ARE GUARANTEED BY CONTRACT. YOU ACCEPT THE CHANGES IF YOU USE THE SERVICE AFTER NOTICE IS PROVIDED**.

*Id.* (emphasis in original).

In 2011, Frontier utilized this modification provision to alter the Terms and Conditions by adding an arbitration provision requiring any dispute between a customer and Frontier to be resolved by binding arbitration on an individual basis.   *Id.*   Frontier included a notice of this change in the September 2011 billing statement, which provided as follows:

> As part of our Terms and Conditions of service, Frontier has recently instituted a binding arbitration provision to resolve customer disputes. This provision will become effective 45 days from the date of this bill. Please refer to www.frontier.com or call Frontier 1-800-426-7320, option 3 for more information.

*Id.*

In January 2012, Frontier revised the arbitration provision to include terms that Frontier described as more "consumer friendly," and sent a notice of these revisions in the January 2012

billing statements. *Id.* Then, in November 2012, Frontier placed a folded, paper copy of the Terms and Conditions, including the arbitration provision, in each customer's billing statement and included the following notice:

> Frontier has made revisions to the Terms and Conditions that apply to your Residential Frontier Internet service. The revised Terms and Conditions are posted at www.frontier.com/terms/ and are included as a special insert in this bill. By using and paying for Frontier Internet services, you are agreeing to these revised Terms and Conditions and the requirement that disputes be resolved by individual arbitration instead of class actions and/or jury trials. You may opt out of the revised Terms and Conditions and instead remain subject to your previously applicable terms by calling 1-866-606-2849 . . . within 30 days from the date of this bill.

*Id.* at 148.

On October 14, 2014, the respondents filed a complaint, seeking, in part, declaratory relief that they had not agreed to arbitrate any claims arising from Frontier's service. *Id.* Frontier filed a motion to compel arbitration and to dismiss the action, or, in the alternative, to stay the action. *Id.* The circuit court denied the motion to compel arbitration and to dismiss, finding, in part, that an agreement to arbitrate was never formed because the respondents never assented to the arbitration provision. *Id.*

Frontier appealed, challenging the circuit court's finding by arguing that its billing statement (1) specifically gave notice that a modification to the Terms and Conditions was being made relating to the arbitration provision, which was to become effective in forty-five days; (2) referred customers to its website, where the Terms and Conditions could be accessed online; and (3) advised that customers could also call Frontier at a particular extension for information concerning the modification. *Id.* at 149, 151. Conversely, the respondents asserted that (1) the notice of the changes was obscured because it appeared on page four of the bill after many other notices, whereas customers need only look at the first page to make the payment; (2) the Terms

16

and Conditions were difficult to find on Frontier's website; and (3) they never actually read the arbitration provision because it was not printed separately and directly on the bill but rather the entirety of the Terms and Conditions was included in the November 2012 bill. *Id.* at 149, 151.

The WVSCA applied the principles of unilateral contract modification from *Hogue* and reversed the circuit court's determination because Frontier provided reasonable notice to its customers of the changes to its terms and conditions. *Id.* at 151. The WVSCA first acknowledged that the concept of mutual assent to modifications of unilateral contracts is an underdeveloped area of law in West Virginia:

> In *Collins v. City of Bridgeport*, 206 W.Va. 467, 525 S.E.2d 658 (1999), we discussed the reasonable notice requirement set forth in *Hogue*. Although "reasonable notice" was not defined, this Court found that reasonable notice was met by printing a new policy in a personnel policy manual. *Id.* at 476, 525 S.E.2d at 667. In adopting the rule on reasonable notice, however, this Court in *Hogue* discussed a Washington Supreme Court case, *Gaglidari v. Denny's Restaurants, Inc.*, 117 Wash.2d 426, 815 P.2d 1362 (1991), which recognized the same right to reasonable notice. In *Gaglidari*, the employer argued that copies of the changed policy manual were often left in the employees' lounge, seemingly by new employees who were disposing of them. *Id.* at 435, 815 P.2d at 1367. The *Gaglidari* court found that it would be "wholly fortuitous" that current employees might actually read any copies of the policies left in the employees' lounge by the new employees, and found this was insufficient to provide reasonable notice to the employees of the changes. *Id.*

*Id.*

The WVSCA reasoned that the "facts differ drastically from those in *Gaglidari* because it [was] not 'wholly fortuitous' that [] customers would read their bills in the entirety," or that, "based on the notice enclosed in the bill, [customers] would read the provision online, read the enclosed Terms and Conditions included in the November 2012 bill, or call to inquire about the amended provision . . .." *Id.* Rather, there was "clear evidence that Frontier provided written notice of the change to the Terms and Conditions to its customers, which is consistent with the reasonable notice

found in *Collins*."   *Id.*   "The fact that Respondents neither availed themselves of any paper or electronic source of information on the change nor called the number provided for additional information does not detract from the reasonableness of the notice."   *Id.*   Thus, the WVSCA held that "Frontier provided reasonable notice to its customers of its changes to the unilateral contract, and Respondents assented to the changes by virtue of continuing to subscribe to Frontier's Internet service after the reasonable notice was provided."   *Id.* at 152.

In this case, Suddenlink reserved the right to make unilateral modifications to the original RSA—and the 2017 Arbitration Agreement contained within—as discussed above.   Specifically, the RSA provided that "Suddenlink may, in its sole discretion, change, modify, add, or remove portions of this Agreement at any time by posting the amended Agreement on the Company website . . . or by giving Customer notice in accordance with Section 22 of the Agreement."[3] (ECF No. 8-2 at 37.)   The RSA further provides that "[i]f Customer does not agree to the revised [RSA], Customer must immediately notify Suddenlink of Customer's intent to terminate Service and . . . return all Equipment."   (*Id.*)

Thus, like the modification provision in *Sheridan*, Suddenlink's modification clause states that Suddenlink may unilaterally modify the terms of the RSA, including the 2017 Arbitration Agreement.   Also like the modification provision in *Sheridan*, Suddenlink's modification clause states that customers can opt out of the updated terms.   Yet, despite Suddenlink's reliance on *Sheridan*, (*see* ECF Nos. 9 at 17; 14 at 8; 22 at 17; 25 at 7), that is where the similarities end.

Unlike the modification provision in *Sheridan* that required Frontier to give customers notice of any changes to the terms, Suddenlink's modification clause states that it can accomplish

---

[3] Specifically, the RSA allows Suddenlink to provide notice via its website, email, postal mail, or telephone, and "Customer agrees that any one of the foregoing will constitute sufficient notice."   (ECF No. 8-2 at 46.)

such a unilateral modification by giving customers notice *or* simply by posting the amended RSA

to the company website.[4]   Also unlike the reasonable notices in *Sheridan* that explicitly informed

customers of changes that had been made, Suddenlink's "notices" did not inform customers of *any*

*changes* to the RSA.   Instead, the prompt Plaintiff received during service visits, in email

confirmations, and on billing statements merely reminded her that she was agreeing to the terms

of the RSA without any indication that those terms had changed at all.   Thus, Suddenlink failed

to give Plaintiff "reasonable notice *of the changes*," to the RSA.   *See Hogue*, 431 S.E.2d at 691

(emphasis added); *Sheridan*, 799 S.E.2d at 151.

Further unlike the modification provision in *Sheridan* that provided customers 30 days to

opt out, Suddenlink's modification clause requires customers to opt out "immediately."

Intuitively, this requirement begs the question: how could Plaintiff "immediately" opt out of

subsequent RSAs if Suddenlink did not provide her notice of any changes?   This would require

customers to "constantly check the Suddenlink website" for updated terms,[5] (*see id.* at 8, ¶ 13),

which would be "wholly fortuitous," *see Gaglidari*, 815 P.2d at 1367; *cf. Sheridan*, 799 S.E.2d at

151.   Consequently, it cannot be said that that Plaintiff assented to the subsequent arbitration

agreements when she had neither notice of any changes nor the opportunity to opt out.

Accordingly, Suddenlink's attempted modifications to the 2017 Arbitration Agreement

were ineffective, and the 2017 Arbitration Agreement is operative in this matter.[6]

---

[4] The Court also notes that, based on *Hogue* and its progeny, this provision that purports to allow Suddenlink to modify the terms of the RSA without notice is in contradiction of the law and is not operative.   *See Rollyson v. Jordan*, 518 S.E.2d 372, 380 (W. Va. 1999) ("[A]s a general rule, [courts] enforce[ ] private agreements between parties, to the extent that such agreements do not conflict with the applicable law.").

[5] Chaty makes this particular argument in relation to the "opt-out" provision that is included in a future arbitration agreement.   (ECF No. 11-3 at 8, ¶ 13.)   However, the basis of this argument is still pertinent.

[6] Consequently, the Court will not address the parties' arguments that relate to provisions not contained in the 2017 arbitration agreement.

B.  *Enforceability*

The FFA does not require arbitration when, under generally applicable principles of state law, the agreement would be unenforceable.  *See, e.g., Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 627 (1985); *see also Doctor's Assocs. Inc. v. Casarotto*, 517 U.S. 681, 687 (1996).  Thus, the FAA allows "agreements to arbitrate to be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability.'"  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (quoting 9 U.S.C. § 2 and *Doctor's Associates*, 517 U.S. at 687).  Here, Plaintiff argues that the 2017 Arbitration Agreement is unconscionable.[7]  (*See* ECF No. 11 at 14–20.)

"The doctrine of unconscionability means that, because of an overall and gross imbalance, one-sidedness or lop–sidedness in a contract, a court may be justified in refusing to enforce the contract as written. The concept of unconscionability must be applied in a flexible manner, taking into consideration all of the facts and circumstances of a particular case."  *Brown v. Genesis Healthcare Corp. (Brown I)*, 724 S.E.2d 250, 283–84 (W. Va. 2011) (reversed on other grounds). "A determination of unconscionability must focus on the relative positions of the parties, the adequacy of the bargaining position, the meaningful alternatives available to the plaintiff, and the existence of unfair terms in the contract."  *See id.* at 284 (internal quotations omitted).  "[A] contract term is unenforceable if it is *both* procedurally and substantively unconscionable," but "both need not be present to the same degree."  *Id.* at 289 (emphasis added).  Instead, "[c]ourts should apply a 'sliding scale' in making this determination: the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the

---

[7] Although Plaintiff challenges the validity and enforceability of latter versions of the 2017 Arbitration Agreement, the Court will consider these arguments to the extent that they can be applied to the 2017 Arbitration Agreement.

conclusion that the clause is unenforceable, and vice versa." *Id.* at 289 (internal citations omitted).

1. Procedural Unconscionability

Procedural unconscionability requires "gross inadequacy in bargaining power." *Adkins*, 303 F.3d at 502 (quoting *Troy Mining Corp. v. Itmann Coal Co.*, 346 S.E.2d 749, 753 (W. Va. 1986)).    The WVSCA provided the following guidance regarding the procedural unconscionability analysis:

> Procedural unconscionability is concerned with inequities, improprieties, or unfairness in the bargaining process and formation of the contract. Procedural unconscionability involves a variety of inadequacies that results in the lack of a real and voluntary meeting of the minds of the parties, considering all the circumstances surrounding the transaction. These inadequacies include, but are not limited to, the age, literacy, or lack of sophistication of a party; hidden or unduly complex contract terms; the adhesive nature of the contract; and the manner and setting in which the contract was formed, including whether each party had a reasonable opportunity to understand the terms of the contract.

*Brown v. Genesis Healthcare Corp. (Brown II)*, 729 S.E.2d 217, 227 (W. Va. 2012) (quoting *Brown I*, 724 S.E.2d at 261).    "Considering factors such as these, courts are more likely to find unconscionability in consumer transactions and employment agreements than in contracts arising in purely commercial settings involving experienced parties." *Id.* (quoting *Brown I*, 724 S.E.2d at 285).

In this case, Plaintiff does not argue that (1) her age, literacy, or sophistication or (2) hidden contract terms made the arbitration agreement procedurally unconscionable.    (*See generally* ECF No. 11, 23.)    Nevertheless, the bargaining power between Plaintiff and Suddenlink was unquestionably unequal in that Plaintiff was a relatively unsophisticated consumer contracting with corporate Defendants who drafted the 2017 Arbitration Agreement and included it as

21

boilerplate language in the RSA.   Further, although unclear, Plaintiff seems to argue that the RSA—and the included arbitration agreement—are contracts of adhesion, that the terms are unduly complex, and that she did not have a reasonable opportunity to understand the terms of the 2017 Arbitration Agreement.   Each of these factors are discussed below.

i.    Adhesive nature of the contract

Plaintiff takes great issue with the fact that the 2017 Arbitration Agreement is a contract of adhesion.   (*See generally* ECF No. 11.)   "A contract of adhesion is one drafted and imposed by a party of superior strength that leaves the subscribing party little or no opportunity to alter the substantive terms, and only the opportunity to adhere to the contract or reject it."   *Brown II*, 729 S.E.2d at 228 (quoting *Brown I*, 724 S.E.2d at 261); *see also State ex rel. Dunlap v. Berger*, 567 S.E.2d 265, 273 (W. Va. 2002) ("'Adhesion contracts' include all 'form contracts' submitted by one party on the basis of this or nothing . . .." (internal citations omitted)).

Suddenlink does not dispute the adhesive nature of the arbitration agreement.   (*See generally* ECF No. 14, 25.)   Indeed, there is no genuine issue of material fact that the arbitration agreement is an adhesion contract.   Suddenlink (or its attorneys) drafted terms of the 2017 Arbitration Agreement, Plaintiff was not given an option to negotiate or modify any of the terms, and the 2017 Arbitration Agreement was offered on a take it or leave it basis.   *Cf. U.S. ex rel. TBI Invs., Inc. v. BrooAlexa, LLC*, 119 F. Supp. 3d 512, 530 (S.D.W. Va. 2015) (finding that a contract was not adhesive when the plaintiff had the opportunity to negotiate the terms).

The Court is cognizant that "the bulk of contracts signed in this country, if not every major Western nation, are adhesion contracts . . .."   *Pingley v. Perfection Plus Turbo–Dry, LLC*, 746 S.E.2d 544, 550 (W. Va. 2013) (quotation marks and citation omitted). Thus, "[p]rocedural

unconscionability often begins with a contract of adhesion," but finding that there is an adhesion contract is not the end of the analysis. *Brown II*, 729 S.E.2d at 228 (quoting *Dunlap*, 567 S.E.2d at 273). Nevertheless, the adhesive nature of the arbitration agreement is a factor that supports a finding of procedural unconscionability. *Id.* at 227.

Similarly, Plaintiff argues that "[t]he process for opting out of arbitration is useless, unreasonable, and unfair . . .." (ECF No. 11-3 at 8.) Unlike latter versions, the 2017 version of the Arbitration Agreement does not include an opt-out provision, which actually supports a finding of procedural unconscionability because, logically, it indicates a lack of a voluntary agreement. Although "the omission of an 'opt out' provision is not in itself sufficient evidence that an arbitration agreement is grossly unfair and thus unenforceable on grounds of procedural unconscionability," it is "one of multiple factors to consider in evaluating a claim of procedural unconscionability." *See* Syllabus Point 2, *Nationstar Mortg., LLC v. West*, 785 S.E.2d 634 (W. Va. 2016). Thus, this factor also supports a finding of procedural unconscionability.

   ii.  Unduly complex terms

Plaintiff also states that the 2017 Arbitration Agreement is "extremely difficult to understand" and contains "nonsensical requirements," without further elaboration.[8] (*See* ECF No. 11-3 at 5.) The Court interprets this as an assertion that the arbitration agreement includes "unduly complex terms." *See Brown II*, 729 S.E.2 at 227. Suddenlink did not reply to this argument. (*See generally* ECF No. 14, 25.)

---

[8] Because Plaintiff's response in opposition proceeded under the assumption that the March 2022 version of the RSA was operative, this argument references "section 24" of the RSA, (ECF No. 11-3 at 5), whereas the 2017 Arbitration Agreement is found in section 20 of the RSA, (ECF No. 8-2).

The WVSCA has not provided guidance on the definition of "unduly complex" in this context. [9]   Nevertheless, "[u]nduly" is defined as "excessively" or "in an undue manner." *Unduly*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/unduly (last visited November 30, 2022); *see also* Undue, *Black's Law Dictionary* (11th ed. 2019) ("Excessive or unwarranted").   "Complex" is defined as "not easy to understand or explain."   *Complex*, Britannica Dictionary, https://www.britannica.com/dictionary/complex (last visited November 30, 2022); *see also* Complexity, *Black's Law Dictionary* (11th ed. 2019) ("One of many details or features of something that make it hard to understand or deal with").   Thus, terms are "unduly complex" when they are excessively difficult to understand.

Here, some of the terms of the 2017 Arbitration Agreement—specifically, the terms that lay out the "Rules Governing Arbitration"—are excessively difficult to understand.   To start, the 2017 Arbitration Agreement states that "[a]ll arbitration shall be initiated and conducted in accordance with the Commercial Arbitration Rules and Mediation Procedures of the [American Arbitration Association]," ("AAA Rules").   (ECF No. 8-2 at 45.)   A review of the AAA Rules reflets a set of elaborate rules and procedures for consumer arbitration, as well as a separate set of rules and procedures for the appellate process.   *See* American Arbitration Association, Non-Binding Consumer Arbitration Rules (2016).   Suddenlink made no effort to summarize or even include these rules in the 2017 Arbitration Agreement.   As Justice Workman of the WVSCA has observed, "even the most diligent consumer who on his or her own initiative obtains the rules from

---

[9] If, as here, the state's highest court has not directly addressed the issue, a federal court sitting in diversity "must anticipate how it would rule" to determine the meaning of state law.   *See Liberty Univ., Inc. v. Citizens Ins. Co. of Am.*, 792 F.3d 520, 528 (4th Cir.2015).   To that extent, the WVSCA consistently gives words their "plain, ordinary meaning."   *See, e.g.*, *Murray v. State Farm Fire & Cas. Co.*, 489, 509 S.E.2d 1, 13 (W. Va. 1998) (analyzing language in an insurance policy); *Fountain Place Cinema 8, LLC v. Morris*, 707 S.E.2d 859, 864 (W. Va. 2011) (analyzing language in a statute); *Crockett v. Andrews*, 172 S.E.2d 384, 387 (W. Va. 1970) ("Plain language should be afforded its plain meaning.").

the AAA and reads them would have a most difficult time accurately assessing his or her exposure." *Nationstar*, 785 S.E.2d at 646 n.6 (Workman, J., dissenting) (quoting *DeVito v. Autos Direct Online, Inc.,* 37 N.E.3d 194, 202–03 (Ohio 2015)).

Additionally, even though the 2017 Arbitration Agreement states that "arbitration" is conducted in accordance with the AAA rules, *relief and fees* awarded in such arbitration are evidently *not always* governed by the AAA rules.  Section 20(b)(ii) of the 2017 Arbitration Agreement states that "Suddenlink will pay all AAA filing, administration, and arbitrator fees for any arbitration initiated," but "*if* the arbitrator's award is less than the amount of Suddenlink's last written settlement offer before an arbitrator was selected, *then* the payment of all such fees will be governed by the AAA Rules."  (*Id.* (emphasis added).)   Conversely, *if* "the arbitrator issues you an award that is greater than the amount of Suddenlink's last written settlement offer before an arbitrator was selected, *then* Suddenlink will pay you the amount of the award or $5,000, whichever is greater; and; as well as your reasonable attorneys' fees, and reimburse any expenses." (*Id.* at 46 (emphasis added.)   Yet, "*if* you initiate an arbitration in which you seek more than $75,000 in damages, the payment of these fees will be governed by the AAA rules."  (*Id.* at 45.) So, sometimes the AAA Rules apply to relief and fees awarded but sometimes they do not.

Then, to further frustrate any remaining understanding, even if the relief and fees are governed by the AAA Rules, not *all of the AAA Rules* apply because Suddenlink has evidently picked which AAA Rules governing relief and fees benefits it and dismissed those that do not. For example, the arbitrator "may not award relief in excess of or contrary to what [the RSA] provides or award punitive damages or any other damages aside from the prevailing party's actual damages."  (*Id.* at 46.)   Importantly, the AAA rules do not prohibit punitive damages or put a cap

on the award amount.   *See* American Arbitration Association, Non-Binding Consumer Arbitration Rules Rule 42(a) (2016) ("The arbitrator may grant any non-binding remedy, relief, or outcome that the parties could have received in court . . . in accordance with the law(s) that applies to the case.")   So, to recap: the AAA Rules apply to arbitration, generally, but do not always apply to relief and fees, and, even when AAA Rules apply to relief and fees, only some of them actually do.

Drawing all reasonable inferences in favor of Plaintiff, *see Barach*, 392 F. Supp. 3d at 650, a reasonable jury could find that it would be excessively difficult to understand the complicated and inconsistent circumstances in which the elaborate AAA Rules apply, *see News & Observer Publ. Co. v. Raleigh–Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010) ("Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party.")   As such, this factor supports a finding of procedural unconscionability.

iii.      Reasonable opportunity to understand the terms of the contract

Plaintiff also contends that, while she may have been given a screen with terms at installation, "it would be absolutely ridiculous to expect a customer who is trying to get their services installed or fixed to stand there and read 25 plus pages of terms and conditions . . .." (ECF No. 11-3 at 10–11.)   Suddenlink replies that a party to a contract has a duty to read the instrument.   (ECF No. 14 at 7 (collecting cases).)

Suddenlink is correct that contracting parties have a duty to *read* the terms, but that's not the question before the Court.   Rather, the question is whether Plaintiff had a *reasonable*

*opportunity to understand* the terms.   As discussed below, Plaintiff did not have such an opportunity.

To start, the patently unfair circumstances surrounding Suddenlink's installation process give customers little to no chance of understanding what they are agreeing to in the RSA.   Plaintiff was handed a small, mobile device screen and was instructed to read through approximately twenty-two, full sized pages of text.   She would have had to read approximately seven, full size pages of text before even getting to the 2017 Arbitration Agreement, which itself includes unduly complex terms, as discussed above.   Further, Plaintiff had to do this while a service technician waited for her to affix her signature.   While these facts do not indicate that Plaintiff was prohibited from reading the 2017 Arbitration Agreement, requiring her to read through complicated contract terms on a mobile device while a service technician waited in her home until she affixed her signature is not a "reasonable opportunity" to read—not to mention *understand*—the 2017 Arbitration Agreement.

Further, Plaintiff claims that it was procedurally unconscionable when Suddenlink failed to provide copies of the AAA rules.   (ECF No. 11 at 16 (citing *Harper v. Ultimo*, 113 Cal. App. 4th 1402, 1406 (Cal. Ct. App. 2003).)   In response, Suddenlink argues that the holding in *Harper* has no support under West Virginia law or otherwise.   (*See* ECF No. 14 at 13–14.)   Further, Suddenlink argues that, even if *Harper* did reflect West Virginia law on procedural unconscionability, such a rule would be preempted by the FAA because it is not a ground for the revocation of any contract.   (*Id.* (quoting *Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987).)

Suddenlink's caselaw summary is correct, and the Court agrees that the singular failure to attach the AAA Rules to a contract does not, by itself, render the 2017 Arbitration Agreement

procedurally unconscionable.   However, that does impact the Court's inquiry as to whether Plaintiff had a reasonable opportunity to understand the terms of the 2017 Arbitration Agreement. The AAA Rules are terms of the 2017 Arbitration Agreement, but were not included, summarized, attached, or even hyperlinked in the 2017 Arbitration Agreement.   So, how could Plaintiff have had the opportunity to understand the AAA Rules when they were in no way included in the 2017 Arbitration Agreement?   It follows, then, that if Plaintiff did not have a reasonable opportunity to understand the AAA Rules—which purportedly govern the "arbitration" process—then she did not have a reasonable opportunity to understand the terms of the 2017 Arbitration Agreement.

While Suddenlink contends that the AAA Rules are "readily available on the internet," (ECF No. 14 at 13), the fact remains that Plaintiff was already tasked with reading complicated contract terms on a small mobile device while a service technician waited for her signature.   Thus, in addition to that task, Suddenlink expected Plaintiff to, on her own initiative, search out, find, read, and understand the AAA Rules—and the convoluted manner in which they apply to disputes with Suddenlink—before agreeing to the terms of the RSA and 2017 Arbitration Agreement.   This is blatantly unreasonable.   Thus, this factor supports a finding of procedural unconscionability.

Ultimately, the unequal sophistication between the parties, adhesive nature of the contract, unduly complex terms, and lack of opportunity to review the terms of the 2017 Arbitration Agreement demonstrate a "gross inadequacy in bargaining power," *see Adkins*, 303 F.3d at 502, that resulted "in the lack of a real and voluntary meeting of the minds," *see Brown II*, 729 S.E.2d at 227.   Accordingly, the Court finds that the 2017 Arbitration Agreement is procedurally unconscionable.

    2.   <u>The 2017 Arbitration Agreement is substantively unconscionable.</u>

"Substantive unconscionability involves unfairness in the contract itself and whether a contract term is one-sided and will have an overly harsh effect on the disadvantaged party." *Brown II*, 729 S.E.2d at 228 (quoting *Brown I*, 724 S.E.2d at 262). "[N]o single, precise definition of substantive unconscionability can be articulated because the factors to be considered vary with the content of the agreement at issue." *Id.* at 229 (citation omitted). "Generally, courts should consider the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and public policy concerns." *Id.* at 228 (quoting *Brown I*, 724 S.E.2d at 262). "[C]ourts should assess whether a contract provision is substantively unconscionable on a case-by-case basis." *Id.* at 229 (quoting *Brown I*, 724 S.E.2d at 288).

In this case, Plaintiff argues that the 2017 Arbitration Agreement is substantively unconscionable because it lacks mutuality and prohibits class actions.[10]  (*See* ECF No. 11 at 18–19.)  In reply, Suddenlink contends that its arbitration agreement "does not contain any degree of substantive unconscionability."  (ECF No. 14 at 12.)  Each of Plaintiff's arguments are addressed in turn below.

       i.    Class actions

Plaintiff claims that the 2017 Arbitration Agreement is substantively unconscionable because, among other terms, the prohibition of class actions makes the pursuit of small claims financially unrealistic.  (*See* ECF No. 11 at 19).  Suddenlink counters that Plaintiff's argument regarding the 2017 Arbitration Agreement's prohibition on class actions is foreclosed by WVSCA

---

[10] Plaintiff also argues that the arbitration agreement imposes substantial costs because it requires customers to "file both in Court and in arbitration, effectively doubling the filing fees," and allows Suddenlink to appeal to a three-person arbitration panel under the Optional Appellate Arbitration Rules.  (ECF No. 11 at 18–19.)  Plaintiff also finds fault with the arbitration agreement's imposition of a cost-shifting attorneys' fees provision, (*id.* at 17–18), and the waiver of private attorney general proceedings, (*id.* at 19).  Nevertheless, because those provisions are not contained in the 2017 Arbitration Agreement, the Court declines to address these arguments.

29

and Supreme Court precedent.   (ECF No. 14 at 15.)   While Suddenlink's assertion is too broad, Plaintiff's argument regarding class actions nevertheless fails.

As discussed above, the FAA says that an arbitration agreement "shall be valid, irrevocable, and enforceable, *save upon such grounds as exist at law or in equity for the revocation of any contract*."   9 U.S.C. § 2 (emphasis added).   The Supreme Court has interpreted Section 2 to contain two clauses: (1) an enforcement mandate, which renders agreements to arbitrate enforceable as a matter of federal law, and a saving clause, which permits invalidation of arbitration clauses on grounds applicable to "any contract."   *See Concepcion*, 563 U.S. at 339–340.   These clauses jointly establish "an equal-treatment principle: A court may invalidate an arbitration agreement based on 'generally applicable contract defenses' like fraud or unconscionability, but not on legal rules that 'apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue.'"   *Kindred Nursing Centers L. P. v. Clark*, 581 U.S. 246, 251 (2017) (quoting *Concepcion*, 563 U.S. at 339).

As such, the FAA "preempts any state rule discriminating on its face against arbitration—for example, a law 'prohibit[ing] outright the arbitration of a particular type of claim.'"   *Id.* (quoting *Concepcion*, 563 U.S. at 341).   Further, the FAA's pre-emptive effect can extend to "generally applicable" doctrines, such as duress or unconscionability, that are "applied in a fashion that disfavors arbitration."   *Concepcion*, 563 at 341; *see also id.* at 342 (stating that "nothing in [Section 2] suggests an intent to preserve state-law rules that stand as an obstacle to the accomplishment of the FAA's objectives"); *Lamps Plus, Inc. v. Varela*, 587 U.S. ——, ——, 139 S.Ct. 1407, 1415, 203 L.Ed.2d 636 (2019); *Viking River Cruises, Inc. v. Moriana*, 142 S. Ct. 1906, 1918 (2022), *reh'g denied*, No. 20-1573, 2022 WL 3580311 (U.S. Aug. 22, 2022).   Thus, even

when facially nondiscriminatory, state rules must not disfavor arbitration as applied by "interfere[ing] with fundamental attributes of arbitration[.]"   *Concepcion*, 563 U.S. at 344.

Specifically, the *Concepcion* Court analyzed a California rule that an arbitration agreement is unconscionable when it is included "in a consumer contract of adhesion in a setting in which disputes between the contracting parties predictably involve small amounts of damages," and "it is alleged that the party with the superior bargaining power has carried out a scheme to deliberately cheat large numbers of consumers out of individually small sums of money[.]"   *See id.* at 340 (quoting *Discover Bank v. Superior Court*, 113 P.3d 1100 (CA 2005)).   The Supreme Court held that this rule was preempted by the FAA because it "interferes with arbitration," *id.* at 346, because "the 'changes brought about by the shift from bilateral arbitration to class-action arbitration' are "fundamental'" *id.* at 347 (quoting *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 686 (2010)), as a "structural matter" because "the switch from bilateral to class arbitration sacrifices the principal advantage of arbitration—its informality—and makes the process slower, more costly, and more likely to generate procedural morass than final judgment," *id.* at 348.   "As a result, class procedures cannot be imposed by state law without presenting unwilling parties with an unacceptable choice between being compelled to arbitrate using procedures at odds with arbitration's traditional form and forgoing arbitration altogether."   *Moriana*, 142 S. Ct. at 1918.

These cases make it clear that waivers of class actions cannot necessarily render an arbitration agreement unenforceable, nor can it render an arbitration agreement unconscionable *per se*, because such a rule would be preempted by the FAA.   *See Concepcion*, 563 U.S. at 344. Nevertheless, even after *Concepcion* and its progeny, the doctrine of unconscionability remains a valid defense to a petition to compel arbitration.   *See Clark*, 581 U.S. at 251; *Moriana*, 142 S. Ct.

at 1917 (quoting *Clark*).   Thus, within an unconscionability analysis, the Court can consider the value of the benefits of a right waived without regard to any advantage inherent to a class action.[11]

To that extent, the only benefit that Plaintiff claims she lost is the financially realistic ability to pursue small claims, (ECF No. 11 at 19), and the Court disagrees.   Under the AAA Rules, the filing fee for a single consumer case is capped at $200.   *See* American Arbitration Association, Non-Binding Consumer Arbitration Rules, Rule 35.   Further the 2017 Arbitration Agreement states that Suddenlink will generally pay all AAA filing, administration, and arbitrator fees.[12] (*See* ECF No. 8-2 at 45.)   Customers only have to reimburse Suddenlink if (1) the arbitrator finds that the claim or demand for relief are frivolous or brought for an improper purpose or (2) the arbitrator's award is less than the amount of Suddenlink's last written settlement offer.   (*Id.*)

Thus, Plaintiff's argument fails to the extent she argues that the 2017 Arbitration Agreement is substantively unconscionable because it makes the pursuit of small claims financially unrealistic.

### ii.     Lack of mutuality

It is axiomatic that "[w]hen parties agree to resolve their disputes through arbitration, they concomitantly agree to *not* resolve their disputes by going to court."   *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Coe*, 313 F.Supp.2d 603, 615 (S.D. W.Va.2004) (emphasis in original).

---

[11] *Compare Sonic-Calabasas A, Inc. v. Moreno*, 247 P.3d 130, *cert. granted, judgment vacated*, 565 U.S. 973 (2011) (*Sonic I*) (holding, as a categorical rule, that it is contrary to public policy and unconscionable for an arbitration agreement to include a waiver of the right to a Berman hearing, which is a dispute resolution forum established by the Legislature to assist employees in recovering wages owed), *with Sonic-Calabasas A, Inc. v. Moreno*, 311 P.3d 184 (Cal. 2013), *cert. denied* 134 S.Ct. 2724 (2014) (*Sonic II*) (concluding that the fact that the FAA preempts *Sonic I*'s rule categorically prohibiting waivers of a Berman hearing in an arbitration agreement "does not mean that a court applying unconscionability analysis may not consider the value of benefits provided by the Berman statutes, which go well beyond the hearing itself").

[12] The 2017 Arbitration Agreement states that the payment of these fees will be governed by the AAA Rules if a customer seeks more than $75,000 in damages, (ECF No. 8-2 at 45), but this provision is not applicable to Plaintiff's argument regarding "small claims."

Consequently, "[s]ubstantive unconscionability may manifest itself in the form of an agreement requiring arbitration only for the claims of the weaker party but a choice of forums for the claims of the stronger party." *Brown II*, 729 S.E.2d at 228 (internal quotations and citations omitted). Therefore, "[a]greements to arbitrate must contain at least 'a modicum of bilaterality' to avoid unconscionability." *Id.* (internal citations omitted); *see also State ex rel. Richmond American Homes v. Sanders*, 717 S.E.2d 909, 922 (W. Va. 2011) (adhesion contract "established an arbitration process that lacked any modicum of bilaterality or mutuality—it limited the plaintiffs' rights [to seek damages] and not [the defendant's]" and was therefore unconscionable).   While "a one-sided contract provision may not be unconscionable under the facts of all cases," *Dan Ryan Builders, Inc. v. Nelson*, 737 S.E.2d 550, 559 (W. Va. 2012), "[s]uch unilateral arbitration clauses lend themselves extremely well to the application of the doctrine of unconscionability because the right the clause bestows upon its beneficiary is so wholly one-sided and unfair," *id.* (internal quotations and citations omitted).

Here, Plaintiff contends that that the arbitration agreement lacks mutuality, but cites terms that are absent in the 2017 Arbitration Agreement.   (ECF No. 23 at 10.)    Nevertheless, the Court notes two provisions in the 2017 Arbitration Agreement that lack mutuality.   Each is discussed below.

First, customers must resolve all claims through arbitration, but "SUDDENLINK MAY CHOOSE TO PURSUE CLAIMS IN COURT IF THE CLAIMS RELATE SOLELY TO THE COLLECTION OF ANY DEBTS" customers allegedly owe Suddenlink.   (*See* ECF No. 8-2 at 44.)   While it may be argued that the arbitration agreement's exception for collection of debts is minor, its imbalance is significant as applied.   Plaintiff has given up the formal legal procedures

33

and opportunity for review of all claims, including disputes on charges.   Thus, if they dispute a charge, as they do in this case, they must proceed to arbitration, as Suddenlink is trying to compel. Conversely, if Plaintiff had refused to pay the disputed charge, Suddenlink would have been permitted to sue in court to collect the disputed charge.

Further, because of its broad language, the Court questions what claims would not fall into this exception.   Claims related "to the collection of debts" could encompass situations in which customers did not pay their bills, did not return Suddenlink equipment, and almost all other terms contained in the RSA.   Consequently, Suddenlink's ability to pursue claims in court related "solely to the collection of any debts," is, in reality, an exception that swallows the rule.   Clearly, then, this provision gives Suddenlink an advantage and creates an overall imbalance of rights and obligations.

Second, the contractual statute of limitations lacks mutuality.   The arbitration agreement states that "[a]rbitration must be initiated by Customer . . . within one (1) year," and "Customer waives any claim not filed" within one year.   (ECF No. 8-2 at 45.)   This provision limits the time period in which Plaintiff can bring claims against Suddenlink but does not restrict the time period in which Suddenlink can bring suit against Plaintiff.   Further, the 2017 Arbitration Agreement also imposes one-sided procedural requirements by requiring Plaintiff to send by certified mail "Notice of Dispute form" to "Suddenlink Communications, 6151 Paluxy Drive, Tyler, TX 75703[.]"   (*Id.* at 44–45.)   Yet, no similar requirements are imposed upon Suddenlink.

Neither the RSA nor the 2017 Arbitration Agreement provide a justification for this asymmetry, nor is there any indication that these one-sided obligations are warranted or necessary. While these inequitable provisions may not, by themselves, render the arbitration agreement

unconscionable because "at least a modicum of bilaterality" exists, the existence of terms that are so lacking in mutuality nevertheless support a finding of substantive unconscionability.

iii.    Punitive damages

The 2017 Arbitration Agreement also states that the "arbitrator may not award relief in excess of or contrary to what this Agreement provides or award punitive damages or any other damages aside from the prevailing party's actual damages," except provided by statute.   (ECF No. 8-2 at 46.)   Under West Virginia law, punitive damages are appropriate against a defendant "[i]n actions of tort, where gross fraud, malice, oppression, or wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others appear." *Vandevender v. Sheetz, Inc.*, 490 S.E.2d 678, 688 (W. Va. 1997); *see also* Syllabus Point 12, *Marsch v. Am. Elec. Power Co.*, 530 S.E.2d 173, 177 (W. Va. 1999) (noting that punitive damages serve as "punishment for [the defendant's] wilfulness, wantonness, malice, or other like aggravation of his wrong to the plaintiff, over and above full compensation for all injuries directly or indirectly resulting from such wrong." (internal quotation marks and citations omitted)).   The WVSCA has previously explained the importance of punitive damages:

> It is axiomatic that when consumers, employees, etc. are the victims of illegal, wilfully and wantonly wrongful, and/or fraudulent misconduct, the social remedy of punitive and penalty damages may be a powerful tool—for the benefit of the plaintiff and for the benefit of society in general—"to punish the wrongdoer and to deter the commission of similar offenses in the future[.]

*Dunlap*, 567 S.E.2d at 278 (quoting *Burgess v. Porterfield*, 469 S.E.2d 114–118 (W. Va. 1996)).

As such, the intended effect of a provision that prohibits punitive damages is that customers are "deprived of their right to invoke and employ an important remedy provided by law to punish and deter illegal, willful, and grossly negligent misconduct," and defendants are "categorically

shielded from any liability for such sanctions, regardless of [their] level of wrongdoing." *Dunlap*, 567 S.E.2d at 278.   Consequently, courts have refused to enforce contract provisions that prohibit an award of punitive damages.   *See In re Cotton Yarn Antitrust Litig.*, 505 F.3d 274, 288–89 (4th Cir. 2007) (citing *Kristian v. Comcast Corp.*, 446 F.3d 25, 48 (1st Cir.2006) (in case involving arbitration of antitrust claims, concluding that arbitration agreement's ban on treble damages was unenforceable, because right to recover treble damages is a substantive right); *Booker v. Robert Half Int'l, Inc.*, 413 F.3d 77, 83 (D.C. Cir. 2005) (concluding that arbitration agreement's ban on punitive damages was not enforceable because civil rights statute under which the plaintiff was proceeding provided for punitive damages); *Hadnot v. Bay, Ltd.*, 344 F.3d 474, 478 & n. 14 (5th Cir.2003) (concluding that arbitration agreement's ban on punitive damages was not enforceable as to the plaintiff's Title VII claim); *Morrison v. Cir. City Stores*, Inc., 317 F.3d 646, 673 (6th Cir. 2003) (concluding that arbitration agreement's restriction on the damages recoverable was not enforceable because it was inconsistent with the damages authorized by Title VII)).   Importantly, the WVSCA has held that an arbitration agreement's prohibition on punitive damages supports a finding of substantive unconscionability.   *See Berger*, 567 S.E.2d at 278; *see also Sanders*, 717 S.E.2d at 923 (agreeing with the trial court's ruling that an arbitration agreement's limitation on the plaintiff's ability to seek punitive damages supported a finding of unconscionability); *cf. State ex rel. AT & T Mobility, LLC v. Wilson*, 703 S.E.2d 543, 548 (W. Va. 2010) (disagreeing with the trial court's finding of unconscionability based, in part, on a ban on punitive damages because the controlling arbitration agreement did not ban punitive damages and the plaintiffs were not seeking punitive damages).

36

In this matter, Plaintiff's claims against Suddenlink include a request for common-law punitive damages, (*see* ECF No. 1-1 at 44–45), that, under West Virginia law, would be potentially available if she were to prevail on certain claims.   While "[g]enerally, punitive damages are unavailable in an action for breach of contract unless the conduct of the defendant constitutes an independent, intentional tort," *Hayseeds, Inc. v. State Farm Fire & Cas.*, 352 S.E.2d 73, 80 (W. Va. 1986), Plaintiff's unjust enrichment claim alleges, in part, that "Defendants obtained payments through actual fraud," (ECF No. 1-1 at 43, ¶ 98), which is an independent, intentional tort. Similarly, while West Virginia law requires "more than a showing of simple negligence to recover punitive damages, *Bennett v. 3 C Coal Co.*, 379 S.E.2d 388, 394 (W. Va. 1989), Plaintiff's negligence claim is based, in part, on Suddenlink's' "gross negligence" and "wilfull and reckless conduct," (ECF No. 1-1 at 44, ¶ 104).   Consequently, the 2017 Arbitration Agreement's prohibition on punitive damages supports a finding of substantive unconscionability.

In sum, the 2017 Arbitration Agreement retains Suddenlink's access to the courts while denying Plaintiff the same access, as well as the ability to obtain potentially justified relief.   The 2017 Arbitration Agreement also imposes significant procedural hurdles on Plaintiff that Suddenlink is not burdened with.   Accordingly, the 2017 Arbitration Agreement, which is "one-sided" and has "an overly harsh effect" on Plaintiff, *see Brown II*, 729 S.E.2d at 228, is substantively unconscionable.

3.   Severability clause

"If a court, as a matter of law, finds a contract or any clause of a contract to be unconscionable, the court may refuse to enforce the contract, enforce the remainder of the contract without the unconscionable clause, or limit the application of any unconscionable clause to avoid

any unconscionable result." *Brown II*, 729 S.E.2d at 227 (quoting *Brown I*, 724 S.E.2d at 261). Yet, "[g]ood authority counsels that severance should not be used when an agreement represents an integrated scheme to contravene public policy." *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 676 (4th Cir. 2016) (internal quotations and citations omitted). Further, "when a party uses its superior bargaining power to extract a promise that offends public policy, courts generally opt not to redraft an agreement to enforce another promise in that contract." *Dillon v. BMO Harris Bank, N.A. ("Dillon I")*, 787 F.3d 707, 713 (4th Cir. 2015) (citing Restatement (Second) of Contracts § 184 cmt. b); *see also Goodwin v. Branch Banking & Tr. Co.*, No. 5:16-CV-10501, 2017 WL 960028, at *5 n.4 (S.D.W. Va. Mar. 10, 2017), *aff'd*, 699 F. App'x 274 (4th Cir. 2017) ("Because the lack of mutuality of the obligation to arbitrate cannot readily be remedied by severing or limiting its application, and because the Court has found that multiple unfair or biased provisions favoring [the drafter] combine to render the arbitration clause unconscionable, the Court concludes that refusing to enforce the arbitration clause in its entirety is the most appropriate remedy.").

To that extent, the Court notes that the RSA contains a severability clause that states that "[i]f any term or condition of this Agreement shall be adjudicated or determined as invalid or unenforceable by a court . . . the remainder of the Agreement . . . shall not be affected and shall remain valid and enforceable to the fullest extent permitted by law." (ECF No. 8-2 at 46.) Neither party addresses the applicability of this provision to the present matter.

Nevertheless, "the mere existence of a severability clause does not suggest that courts have the freewheeling discretion to carve up contracts without consideration of a provision's centrality to the broader agreement it lies within." *In re Blackjewel, L.L.C.*, No. BR 19-30289, 2020 WL 625205, at *3 (S.D.W. Va. Feb. 10, 2020) (Chambers, J.) (citing *Dillon v. BMO Harris Bank, N.A.*

38

("*Dillon II*"), 856 F.3d 330, 336–37 (4th Cir. 2017) (concluding that unenforceable choice of law provisions were "essential to the purpose of" an arbitration agreement and therefore "not severable from the broader" agreement, despite existence of a severability clause)).   Instead, the Fourth Circuit has instructed that "[i]t is a basic principle of contract law that an unenforceable provision cannot be severed when it goes to the 'essence' of the contract."   *Hayes*, 811 F.3d at 675-76 (internal quotations and citations omitted).   Specifically, "[u]nlawful portions of a contract may be severed *only* if: (1) the unlawful provision is not central or essential to the parties' agreement; and (2) the party seeking to enforce the remainder negotiated the agreement in good faith."   *Dillon II*, 856 F.3d at 336 (emphasis added).

Applying these principles in *Hayes*, the Fourth Circuit found that the offending terms of the arbitration agreement at issue went to the "essence" of the agreement, because "the animating purpose of the arbitration agreement was to ensure that [the drafter] and its allies could engage in . . . practices free from the strictures of any federal law."   811 F.3d at 676.   Likewise, in *Dillon II*, the Fourth Circuit found that the drafter "purposefully drafted the . . . provisions in the arbitration agreement to avoid the application of state and federal consumer protection laws."   856 F.3d at 336.    The Fourth Circuit also reasoned that the drafter used its "superior bargaining power . . . in a calculated attempt to avoid the application of state and federal law," which demonstrated an absence of good faith.   *Id.* at 337.

In this case, the offending provisions discussed above go to the "essence" of the Arbitration Agreement.   Suddenlink drafted the Arbitration Agreement to include one-sided terms that limit the time period in which customers can bring claims, impose specific procedural requirements for customers to bring claims, prohibit customers from seeking relief in court, and deprive customers

of their right to important legal remedies.   Because Suddenlink is not burdened by most of these terms, it is clear that "the animating purpose of the arbitration agreement" was not to resolve customers' disputes in the arbitration context, but rather, to substantially inhibit customers from seeking relief all together.   *See Hayes*, 811 F.3d at 676.   Further, Suddenlink demonstrated an absence of good faith by using its "superior bargaining power" to avoid the application of unfavorable laws.   *See Dillon II,* 856 F.3d at 337.   While the prohibition of punitive damages— which applies to customers and Suddenlink—could be severed, the lack of mutuality of the remaining, offending terms cannot readily be remedied by severing or limiting their application. Thus, the entire Arbitration Agreement is unenforceable.

4.   The 2017 Arbitration Agreement is unconscionable and unenforceable.

Ultimately, when considering the clearly inadequate bargaining position of the parties and the one-sided nature of the adhesive 2017 Arbitration Agreement, which includes substantial waivers of Plaintiff's rights, the "sliding scale" is tipped heavily in favor of complete unconscionability.   This matter is akin to the situation the WVSCA described in *Dunlap*:

> This lawsuit is not about arbitration . . . [Under the guise of requiring arbitration, the company] was actually rewriting substantially the legal landscape on which its customers must contend . . . [the company] sought to shield itself from liability . . . by imposing Legal Remedies Provisions that eliminate class actions, sharply curtail damages in cases of misrepresentation, fraud, and other intentional torts, cloak the arbitration process with secrecy and place significant financial hurdles in the path of a potential litigant. It is not just that [the company] wants to litigate in the forum of its choice—arbitration; it is that [the company] wants to make it very difficult for anyone to effectively vindicate her rights, even in that forum. That is illegal and unconscionable[.]

567 S.E.2d at 284–85 (alterations in original).

If the 2017 Arbitration Agreement had simply moved customer disputes from court to arbitration, it would have been protected by state law and federal policies favoring arbitration.

40

Instead, the 2017 Arbitration Agreement attempted to allow Suddenlink to avoid liability for wrongdoing while limiting and prohibiting rights, remedies, and protections that are afforded for the benefit of the public by the laws of West Virginia.   These types of draconian provisions in a contract of adhesion would be just as objectionable and unconscionable if attempted in a contract that made no mention of arbitration.   *See Dunlap*, 567 S.E.2d at 284 n. 17.

Accordingly, the 2017 Arbitration Agreement is unconscionable and unenforceable.

### IV.    CONCLUSION

For these reasons, Defendants' Motions to Compel Arbitration and to Stay Litigation are **DENIED**.   (ECF Nos. 8, 21.)

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:        January 25, 2023

_____
THOMAS E. JOHNSTON, CHIEF JUDGE